| | | |
|---|---|---|
| INTERNATIONAL FOREST PRODUCTS CORPORATION;  AND INTERNATIONAL FOREST PRODUCTS CORPORATION as assignee of STONEWALL PACKAGING, LLC | ) ) ) ) ) ) | No._____ |
| Plaintiffs, | ) ) | JURY DEMAND |
| v. | ) ) | |
| GARY WEST; TURKEY FIELDS, LLC; CUSTOM PACKAGING, INC.; CHUCK COWDEN AND JACKIE COWDEN | ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs, International Forest Products Corporation and International Forest Products Corporation as assignee of Stonewall Packaging, LLC, hereby appear, by and through counsel, their cause of action and Complaint against the Defendants, Gary West, Turkey Fields, LLC, Custom Packaging, Inc., Chuck Cowden and Jackie Cowden, state as follows:

## INTRODUCTION

1.     This case arises out of misrepresentations made by the Defendants to the Plaintiffs in connection with soliciting investment in a corrugator plant project, and the breach of a contract entered into between Custom Packaging and Stonewall Packaging.    Plaintiffs and Defendants are all involved, to varying degrees, in the paper and corrugated product industry. In 2007, non-parties Tim Campbell, Jeff Murphy and Tom Davis began seeking investors for a paper mill and corrugator plant facility. The Defendants were some of the first individuals and/or entities to join the venture, and the Defendants actively assisted Campbell, Murphy and Davis in

attracting additional investors. In soliciting additional investors, including Plaintiff International Forest Products Corporation, the Defendants represented that they were committed to purchasing significant amounts of the output for the project, and the Defendants also provided Plaintiffs with financial projections demonstrating their ability to purchase a significant amount of the output for the project.

2.      Plaintiffs, relying upon the Defendants' representations, invested substantial sums of money in the corrugator plant project. Plaintiff International Forest Products Corporation also caused its bank to deliver a letter of credit as required by Atlantic Capital Bank to finance the project. However, Defendants misrepresented their purchasing capabilities and misrepresented their own participation in the project.

3.      As a result, the project failed. Plaintiffs lost their investment, failed to realize the promised return on investment and have otherwise been damaged.

## PARTIES

4.      Plaintiff International Forest Products Corporation ("IFP") is a Delaware corporation with its principal place of business in Foxboro, Massachusetts.

5.      Stonewall Packaging, LLC ("Stonewall") is a Delaware limited liability company with its principal place of business is Sylva, North Carolina.

6.      Stonewall is currently in receivership, and Grisanti, Galef and Goldress ("GGG") was appointed by the North Carolina Superior Court as the Receiver of Stonewall.

7.      On November 10, 2010, IFP acquired, by and through GGG, certain claims of Stonewall, including Stonewall's claims against the Defendants.

8.      Defendant Custom Packaging, Inc. ("Custom") is a Tennessee corporation with its principal place of business in Lebanon, Tennessee.

2

9.     Defendant Turkey Fields, LLC ("Turkey Fields") is a Tennessee limited liability company with its principal place of business in Lebanon, Tennessee.

10.     Defendant Gary West ("West") is, upon information belief, a Tennessee resident. Defendant West was at all times relevant to this Complaint the President and a board member of Custom with a fifty percent (50%) ownership interest in Custom. Upon information and belief, Defendant West is also the president and board member of Turkey Fields with a one hundred percent (100%) ownership interest in Turkey Fields. Defendant West was at all times relevant to this Complaint a director of Plaintiff Stonewall.

11.     Defendant Chuck Cowden ("Cowden") is, upon information and belief, a Tennessee resident. Upon information and belief, Defendant Cowden was at all times relevant to this Complaint the Executive Vice President of Custom, Chief Operating Officer of Custom, a member of the Board of Directors of Custom, and, along with his wife Jackie Cowden, owns a fifty percent (50%) interest in Custom.

12.     Defendant Jackie Cowden is, upon information and belief, a Tennessee resident. Upon information and belief, Defendant Jackie Cowden is West's sister, and she is Custom's Chief Executive Officer, co-Chairman of Custom's Board of Directors, and owns a fifty percent (50%) interest in Custom along with her husband, Defendant Cowden.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00, excluding interest and costs, and complete diversity of citizenship exists between the Plaintiffs and Defendants.

3

14.    Venue is proper in this Court under 42 U.S.C. § 1391(a) because this is a civil action wherein jurisdiction is founded on diversity of citizenship and this action is brought in the district wherein all the Defendants reside.

## FACTUAL ALLEGATIONS

### Background and Overview of the Corrugated Box Industry

15.    The corrugated product and packaging industry is comprised of various-sized entities that manufacture, assemble, and sell various corrugated products and shipping containers. These products include corrugated boxes, such as those used for shipping; point of purchase displays and boxes designed to showcase specific products at retail, such as those found in grocery stores and other retail establishments; and other corrugated-based products and their component materials (collectively, "Corrugated Products").

16.    Boxes and displays are manufactured from corrugated sheets that are created by combining linerboard and corrugating medium in different combinations to achieve compliance with industry-specific shipping rules and regulations.

17.    Rolls of linerboard and corrugating medium of various basis weights are laminated together using steam and glue on a machine called a corrugator. This process produces "sheets." The Sheets are then cut to specific sizes and either converted to boxes or sold as sheets.

18.    Some entities are vertically integrated and manufacture each component of Corrugated Products themselves. Other entities may purchase one or more components, such as rolls of linerboard and rolls of medium, from outside sources, and then corrugate and manufacture end products from these components purchased from others. Others buy corrugated sheets and convert them to boxes.

4

19.     Smaller entities that are not vertically integrated compete with larger, vertically integrated companies. The larger entities are often able to obtain a competitive advantage because of their superior ability to negotiate and obtain supply of raw materials.

20.     The price at which a Corrugated Products producer is able to sell its product is often heavily dependent on the price at which the producer can purchase the component parts from suppliers. Tight market conditions, caused in part by the dominance of larger competitors, often mean that small producers have difficulty locating a sustainable, dependable raw material source.

## The Parties' Involvement in the Corrugated Products Industry

21.     Plaintiff IFP is a privately owned, family operated company and physical traders of forest products commodities.

22.     Plaintiff Stonewall was formed to combine the monthly required volume of enough sheet plant participants to reach a minimum volume of between 80 million and 100 million board feet per month, which would be manufactured by the corrugator plant. As originally planned, Stonewall would also have its own paper mill, which would manufacture and sell linerboard to Stonewall's corrugator plant. Non-party Jackson Paper Manufacturing Co., Inc. ("Jackson Paper") would sell recycled corrugating medium to Stonewall's corrugator plant. Stonewall's corrugator plant would produce corrugated sheets, which would be sold to certain participants in Stonewall and to other customers in the market.

23.     Defendant Custom is one of the leading sheet plants in the Corrugated Products industry. Defendant Custom buys sheets of Corrugated Product according to customer specifications, and then prints, scores, slots and glues the Corrugated Product into boxes. Defendant Custom has the ability to print and die-cut the Corrugated Product into specific shapes

5

and sizes, with high-quality graphics, according to customer-specific designs. Defendant Custom offers design services, packaging fulfillment, and assembly services to customers.

24. As a sheet plant, Defendant Custom purchases raw materials from various suppliers.

25. Defendant West is nationally known in the corrugated industry through his leadership role in the Association of Independent Converters. West and Custom were held in high esteem by members of the corrugated industry, including the Plaintiffs.

26. Upon information and belief, Defendant West is the President of Custom, co-Chairman of Custom's Board of Directors, and owns a fifty percent (50%) ownership interest in Custom.

27. Upon information and belief, Defendant Cowden is the Executive Vice President of Custom, Chief Operating Officer of Custom, a member of the Board of Directors of Custom, and, along with his wife Jackie Cowden, owns a fifty percent (50%) interest in Custom.

28. Upon information and belief, Defendant Jackie Cowden is West's sister, and she is Custom's Chief Executive Officer, co-Chairman of Custom's Board of Directors, and owns a fifty percent (50%) interest in Custom along with her husband, Defendant Cowden.

29. Defendant Turkey Fields was formed on or about January 16, 2007 by Defendant West for the purposes of pursuing and funding various investments. Upon information and belief, Defendant West owns 100% of Turkey Fields, and Defendant West is the only member and officer of Turkey Fields.

### Formation of Stonewall

30. Non-party Jackson Paper is a leading recycled-paper manufacturer. Jackson Paper produces 100-percent recycled corrugating medium, which is the type of paperboard used in

6

forming the fluted portion of corrugated sheets. Jackson Paper supplies corrugating medium to Corrugated Product manufacturers throughout the southeastern United States. It is the largest recycled-paper manufacturer in North Carolina and has decades of experience in the paper and corrugating medium industry.

31.    Non-parties Timothy L. Campbell ("Campbell") and Jeffrey L. Murphy ("Murphy") are the founding officers of Jackson Paper, with Campbell currently serving as President and Murphy serving as Vice President. Murphy is also Chief Financial Officer of Jackson Paper.

32.    In 2005, Non-party Jackson Paper retained Tom Davis ("Davis"), of Capstone Partners, LLC ("Capstone"), to begin exploring the idea of bringing together a group of independent sheet plants to build a sheet feeder corrugator plant, and possibly a recycled linerboard paper mill. Non-parties Davis and Capstone were respected industry veterans and had many contacts among independent sheet plants

33.    The Stonewall project concept required substantial investment. Thus, Murphy, Campbell and Davis decided that Davis and Capstone would spearhead initial overtures to possible participants and investors in Stonewall.

34.    In 2007, Murphy, Campbell and/or Davis met with Defendants West and Cowden concerning Stonewall.

35.    In early 2007, Defendant West, through Defendant Turkey Fields, agreed to join Stonewall and invested significant funds in Stonewall.

36.    In 2008, Defendants Jackie and Chuck Cowden agreed to join Stonewall, and invested significant funds into Stonewall. Defendant Turkey Fields invested additional funds into Stonewall.

7

37.     Throughout 2007 and 2008, Defendant West and non-parties Murphy, Campbell and Davis met with other independent sheet plants to seek their participation in the Stonewall project.

38.     At these meetings, non-party Davis represented that the concept for Stonewall was for established participants in the Corrugated Product industry to pool their resources to build a recycled paper mill and sheet feeder to supply their component needs efficiently. Davis explained that the project would require more than $100 million dollars in investment. Davis further explained that the total collective investment from the participants would be about $15 million, or $1.5 million per share depending on the number of investors, with the remainder of the necessary capital obtaining through financing.

39.     At these meetings, and throughout 2007 and 2008, Davis, Murphy and/or Campbell also represented that the Stonewall project would only be successful if the members purchased a guaranteed amount of corrugated sheets. The members collectively agreed that this guaranteed amount would be seventy percent (70%) of their overall sheet purchasing activities.

40.     The members, including Defendant West, further agreed that they would executed an Output Purchase Agreement ("OPA") on behalf of their respective entities that guaranteed each member would purchase a certain stated amount of corrugated sheets from Stonewall at a specified price. Defendant West, at all times material, represented that he would sign the OPA on behalf of Defendant Custom and that he had the authority to sign the OPA on behalf of Custom.

41.     On or about November 12, 2007, a meeting was held in Braselton, Georgia at Chateau Elan among investors and potential investors in Stonewall. Defendant West attended this meeting in his capacity as President of Defendant Custom.

8

42.    At the November 12, 2007 meeting, Defendant West, as President of Defendant Custom, stated that Defendant Custom was committed to purchasing 35 million board feet of product per month, which represented thirty-three percent (33%) of the output of the Stonewall corrugator plant, and a large portion of the proposed paper mill's output. This is the amount of product that is later reflected in the OPA executed by Defendant West on behalf of Defendant Custom.

43.    On December 18, 2007, a meeting of investors and potential investors of Stonewall was held in Sylva, North Carolina. Defendant West attended this meeting in his capacity as President of Defendant Custom.

44.    At the December 18, 2007 meeting, Defendant West reiterated that Custom was committed to purchasing 35 million board feet of product per month, which represented thirty-three percent (33%) out the output of the corrugator plant, and a large portion of the proposed paper mill's output. This is the amount of product that is later reflected in the OPA executed by Defendant West on behalf of Defendant Custom.

45.    In January of 2008, Davis and Jackson Paper prepared and distributed to all current members and/or potential members of Stonewall illustrative equity return analyses prepared by Campbell, Murphy and/or Davis.

46.    Upon information and belief, the projections provided to current and/or potential members referenced in Paragraph 43, *supra*, were prepared with information supplied by Defendant West and Custom.

47.    In order to facilitate Stonewall, the investors agreed to form a limited liability company called Stonewall Packaging, LLC.

9

48.     Plaintiff Stonewall was officially formed on January 3, 2008. Stonewall is a Delaware limited liability company registered to do business in the State of North Carolina with its principal place of business in Sylva, North Carolina.

49.     Defendant West was a director of Stonewall at this time.

50.     After Stonewall was formed, efforts to attract additional investors continued.

51.     Throughout 2008 and 2009, Defendant West represented that Defendant Custom would purchase significant corrugated product produced by Stonewall, thereby ensuring sufficient volume to enable Stonewall to function efficiently and profitably. Defendant West represented Custom would purchase 35 million board feet per month, an amount that equated to seventy percent (70%) of the requirements of Custom and thirty-three percent (33%) of the anticipated output of Stonewall.

52.     Throughout 2007 and 2008, Defendant Cowden attended Stonewall member meetings.

53.     Defendants Cowden and Jackie Cowden contributed $144,778 to the Stonewall project.

54.     In 2008 and 2009 Defendant West, through Defendant Turkey Fields, contributed $1,731,000 to the Stonewall project.

55.     Upon information and belief, Defendants West, Cowden and Jackie Cowden were aware that without Custom's involvement and sheet business, the Stonewall project would not succeed.

## Kraft/IFP's Initial Involvement with Stonewall

56.     In February of 2009, Mike Hudson, an employee of Jackson Paper, contacted a representative of IFP to see if IFP would be interested in purchasing an equity stake in the Stonewall project.

57.     On February 9, 2009, Campbell and Mike Hudson, an employee of Jackson Paper, visited Foxboro, Massachusetts to meet with IFP executives at IFP's headquarters. During the week following the meeting, IFP was provided with financial models, contract drafts, and project specifications related to the Stonewall project.

58.     On February 17, 2009, Campbell provided IFP with the equity structure and construction cash flow for Stonewall.

59.     On February 27, 2009, Murphy sent Stonewall's financial model and draft supply agreement to IFP.

60.     On May 8, 2009, IFP signed the Joinder Agreement and paid $500,000 to officially join Stonewall.

61.     As part of the Joinder Agreement, Stonewall agreed to amend the LLC agreement to increase the number of directors of Stonewall from three (3) to four (4) to provide for the admission of a representative of IFP to the Board of Directors of Stonewall.

## Stonewall's Pre-Opening Activities

62.     In May 2009, Stonewall purchased the property where its business and operations would be located for $1.4 million dollars.

63.     In order to obtain bank financing for the Stonewall project, Murphy, Campbell and/or Davis approached several lending institutions to obtain prospective terms for a potential loan between the lending institution and Stonewall.

64.     Ultimately, the members of Stonewall selected Atlantic Capital Bank ("ACB") as the lending institution that would provide financing for the Stonewall project.

65.     Before the final loan documents were signed, on May 27, 2009, ACB visited Custom and Defendant West and toured the Custom facility in Lebanon, Tennessee. This meeting was set up by Greg Butler, the controller of Custom, and lasted three to four hours.

66.     Defendant Custom, through its controller Greg Butler, also provided Custom financial statements to ACB. ACB received and reviewed Custom's financial statements.

67.     Upon information and belief, Defendant Custom represented to ACB that they would purchase significant corrugated product produced by Stonewall, thereby ensuring sufficient volume to enable Stonewall to function efficiently and profitably and ensuring Stonewall's ability to repay the loan.   Upon information and belief, Defendant Custom represented to ACB that Custom would purchase 35 million board feet per month, an amount that equated to seventy percent (70%) of the requirements of Custom and thirty-three percent (33%) of the anticipated output of Stonewall.

68.     ACB relied on the information provided by and representations made by Custom in drafting proposed lending terms.

69.     On June 12, 2009, Defendant West was informed that Stonewall had reached an agreement with ACB. As a condition to the ACB financing, all members of Stonewall, including West, through Turkey Fields, and counter-parties to the OPA, including Custom, were asked to approve changes to the OPA. West, through Turkey Fields as a member of Stonewall, approved such requested changes.

70.     On or about June 30, 2009 Stonewall and ACB agreed to final terms regarding the financing of Stonewall and executed a Credit and Security Agreement ("CSA")

12

71.     The CSA specifically incorporates the OPA executed by Custom and Stonewall as a defined "Material Contract," and the CSA specifically provides that should a party to the OPA suspend and/or seek to suspend its obligations under the OPA, such event may constitute a default of the loan.

72.     As part of the financial terms agreed upon by Stonewall and ACB in the CSA, IFP was required to execute letters of credit in the amount of one million dollars to serve as an additional guarantee should Stonewall default on its obligations to ACB.

73.     Thus, should Stonewall default in its obligations under the CSA, ACB was entitled to immediately present the letter of credit executed by IFP for prompt payment.

74.     On or about June 30, 2009, Defendant West, as President of Custom, executed the OPA agreement. A true and correct copy of the OPA is attached hereto as Exhibit 1.

75.     On or about August 13, 2009, a meeting of the Board of Directors of Stonewall was held in Arden, North Carolina. Defendant West attended the meeting, as well as Jonathan Kraft, Dan Moore and Ed Davis, on behalf of IFP, Campbell, Murphy and Davis.

76.     As part of the meeting, the attendees visited Custom Packaging's Arden facility. During that visit, Defendant West stated to representatives of IFP that "Custom and IFP were the most important players in the Stonewall Project."

77.     One item discussed during the meeting was a software program utilized by Rand-Whitney Container, LLC, an affiliate of IFP, that provides a web-based customer web interface system. Defendant West expressed particular interest in the software for both Stonewall and Custom.

78.     Defendant West expressed further interest in the software for Custom through an email sent to Ed Davis of Rand-Whitney on August 14, 2009. Defendant West stated that he had

13

polled his sales and management team on the software and "it has been all thumbs up." Defendant West also provided a link to Custom Packaging website, presumably so Ed Davis could learn more about West's company.

79.      On or about October 14, 2009, Defendant West, as President of Custom, signed an amended OPA signature page on behalf of Custom. A true and correct copy of the amended OPA signature page is attached hereto as Exhibit 2.

80.      On or about October 18, 2009, Defendant West attended a New England Patriots football game as a guest of IFP. Defendant West brought Julie Boone as his guest. During Defendant West's visit, a meeting was held with Defendant West, Jonathan Kraft, Daniel Kraft, Robert Kraft and Dan Moore. Throughout his time as a guest of IFP, Defendant West introduced himself as the president, owner and representative of Custom Packaging.

### The Opening and Virtual Immediate Failure of Stonewall

81.      Stonewall commenced operations on or about November 30, 2009.

82.      Shortly after beginning operations, Stonewall incurred large operating losses.

83.      Despite the losses, upon information and belief, in November or December of 2009 Defendants Cowden, West and/or Jackie Cowden approached Campbell, Murphy and/or Stonewall and attempted to negotiate a price reduction for Custom that deviated from the price schedules mandated by the OPA. Upon information and belief, Defendant Cowden and/or Jackie Cowden, with knowledge of the existence of the binding OPA, continued to negotiate unreasonably.

84.      From the outset, Defendant West and Custom failed to purchase the 35 million board feet per month, which equated to 33 percent (33%) of Stonewall's production, that Defendant West had represented to Plaintiffs that Custom agreed to purchase.

14

85. In December of 2009, Stonewall's first month of operation, Stonewall did not receive any orders from Custom to apply towards its 35 million board feet per month minimum requirement under the OPA.

86. In December of 2009, Stonewall's first month of operation, Stonewall lost significant amounts of money. The losses were exacerbated by Custom's failure to purchase any product from Stonewall, because Stonewall had relied upon Custom's agreement to purchase thirty-three percent (33%) of Stonewall's production.

87. In January of 2010, Stonewall's second month of operation, Stonewall received Custom's orders for 7.04 million board feet per month, which was well below the 35 million board feet requirements of the OPA, but which evidences Custom's acknowledgment and/or ratification of its obligations under the OPA.

88. In January of 2010, Stonewall's second month of operation, Stonewall lost significant amounts of money. The losses were exacerbated by Custom's decision to purchase significantly less than the amount agreed to in the OPA, because Stonewall had relied upon Custom's agreement to purchase thirty-three percent (33%) of Stonewall's production.

89. By February of 2010, Stonewall had substantially depleted its operating capital and was in danger of being unable to fund day-to-day operations. This situation was exacerbated by Custom's refusal to abide by the terms of the OPA, as Stonewall had relied upon Custom to purchase thirty-three percent (33%) of Stonewall's production.

90. During a meeting of the Board of Stonewall held on February 5, 2010, representatives of the Board asked West if Custom would perform its obligations under the OPA. West stated that Custom intended to honor the terms of the OPA.

15

91.     On February 11, 2010 a meeting was held with Defendant Cowden and certain Stonewall representatives, including Campbell, Murphy and Dan Moore. At the February 11, 2010 meeting, Defendant Cowden stated that Custom was not debating that an agreement exists; however, he claimed that the OPA was not a valid agreement. At the February 11, 2010 meeting, Custom ultimately disavowed the OPA.

92.     On February 13, 2010, a letter was sent from Stonewall to Custom notifying Custom that it was in breach of the OPA.

93.     For the month of February 2010, Stonewall received Custom's orders for 2.16 million board feet per month, which was well below the 35 million board feet requirements of the OPA, but which again evidences Custom's acknowledgement and/or ratification of its obligations under the OPA.

94.     On or about February 24, 2010, on recommendation of the board of directors, including Defendant West, in an effort to rescue the rapidly failing company, Stonewall entered into a management agreement with Sheets, LLC ("Sheets").

95.     Shortly after taking over operations of Stonewall, Sheets' managers indicated to Plaintiffs that, absent a large capital infusion Stonewall would not be viable.

96.     On March 11, 2010, the second formal default letter was sent to Custom Packaging by Murphy on behalf of Stonewall.

97.     On March 15, 2010, Defendant Cowden, on behalf of Custom Packaging, responded to Stonewall's second demand letter. In his March 15, 2010 letter, Defendant Cowden denied that a valid contract existed between Custom and Stonewall.

98.     On March 31, 2010, Stonewall received a notice of default from ACB.

16

99.     On or about April 4, 2010, a conference call was held with the members of Stonewall, including Defendant West. During the call, Defendant West rejected the suggestion from the other members that he resign from the Board of Stonewall. Defendant West reiterated his desire to solve the problems with Defendants Cowden and Jackie Cowden, and Defendant West stated that he would work with Defendant Cowden to "make it work."

100.    On or about April 27, 2010, Stonewall members met to discuss the status of the company. Plaintiffs, with other members of Stonewall, determined that further investment in Stonewall was not likely to save the project and therefore declined to participate in a capital infusion.

101.    During the April 27, 2010 meeting, Stonewall members also collectively determined that without any meaningful participation from Defendant Custom, the project could not succeed. Thus, the members decided to begin looking at how to appropriately wind the business down.

102.    On May 10, 2010, ACB drew IFP's support letter of credit for one million dollars, bringing IFP's total financial contribution for the Stonewall project to two million seven hundred thousand dollars ($2.7 million).

103.    On May 11, 2010, the members of Stonewall voted to put Stonewall into Chapter Seven bankruptcy.

104.    On May 13, 2010, the board of directors of Stonewall reconsidered the vote to Seek Chapter Seven bankruptcy protection and instead and approved GGG to oversee liquidation of Stonewall.

105. On June 9, 2010, by order of the Superior Court of North Carolina, Jackson County, Stonewall was placed into receivership. Grisanti, Galef and Goldress ("GGG") was appointed by the North Carolina Superior Court as the Receiver of Stonewall.

106. Stonewall has ceased all operations. Stonewall's receiver has been, and is currently, in the process of liquidating Stonewall's assets in an attempt to satisfy creditors.

107. On November 10, 2010, IFP acquired, by and through GGG, certain claims of Stonewall, including Stonewall's claims against the Defendants.

## COUNT ONE – BREACH OF CONTRACT

108. Plaintiffs incorporate Paragraphs 1 to 107 by reference as if fully set forth herein.

109. Custom Packaging entered into a valid, legal and binding contract, the OPA, with Stonewall in which Custom agreed to purchase the greater of (i) seventy percent (70%) of the total square footage of sheets Custom purchases in a fiscal year, and (ii) 35 million square feet of sheets per month at a specified price. (See Exhibits 1 and 2). Under the OPA, each purchaser, including Custom, also agreed to pay Stonewall for the price equal to the sheets that it is required to purchase, regardless of whether it placed orders for those sheets. (See Exhibits 1 and 2).

110. Defendant West, the President and 50% owner of Custom, executed the OPA on behalf of Custom on both June 20, 2009 and October 14, 2009. (See Exhibits 1 and 2).

111. Upon information and belief, Defendants Cowden and Jackie Cowden knew and/or should have known that Defendant West executed the OPA on behalf of Custom.

112. In December of 2009, Custom did not place any orders with Stonewall to apply towards its minimum monthly requirement under the OPA, thereby constituting a breach of the OPA. (See Exhibit 2).

18

113.     In January of 2010, Stonewall received Custom's orders for 7.04 million board feet per month, well below the 35 million board feet requirements of the OPA and thereby constituting a breach of the OPA. (See Exhibit 2).

114.     For February of 2010, Stonewall received Custom's orders for 2.16 million board feet per month, well below the 35 million board feet requirements of the OPA and thereby constituting a breach of the OPA. (See Exhibit 2).

115.     As described above, Custom breached its contract with Stonewall.

116.     As a direct and proximate result of this breach of contract on the part of Custom, the Plaintiffs have sustained damages in excess of $2,700,000.00 and more specifically, in an amount as determined by the jury.

## COUNT II – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

117.     Plaintiffs incorporate Paragraphs 1 to 107 by reference as if fully set forth herein.

118.     The Defendants' acts and/or omissions constitute a breach of the implied covenant of good faith and fair dealing.

119.     By reason of the foregoing, the Plaintiffs have suffered money damages in an amount to be proved at trial.

## COUNT III – NEGLIGENT MISREPRESENTATION

120.     Plaintiffs incorporate Paragraphs 1 to 107 as if fully set forth herein.

121.     As described above, Defendants West, Cowden and Jackie Cowden, while acting in the course of their business and in a transaction in which they had a pecuniary interest, supplied Stonewall with faulty information meant to guide Stonewall in its business transactions.

122.     Throughout the formation of Stonewall, including efforts to attract investors and obtain financing, Defendant West represented that Custom was committed to purchase 35

million board feet per month, an amount that equated to seventy percent (70%) of the requirements of Custom and thirty-three percent (33%) of the anticipated output of Stonewall.

123.    Defendants West, Cowden and Jackie Cowden failed to exercise reasonable care in obtaining this information and/or in communicating it to Stonewall and/or the Plaintiffs and/or in communicating to Stonewall and/or the Plaintiffs that Custom was not able to purchase the stated amount of sheets.

124.    The Plaintiffs justifiably relied on the faulty information from Defendants West, Cowden and Jackie Cowden.

125.    As a result of Defendants' negligent misrepresentations, Plaintiffs have been damaged in an amount in excess of $2,700,000.00 and more specifically, in an amount as determined by the jury.

## COUNT IV – INDUCEMENT TO BREACH CONTRACT

126.    The Plaintiffs incorporate Paragraphs 1 to 107 as if fully set forth herein.

127.    Defendant Custom and Stonewall entered into a valid contract, the OPA, whereby Custom agreed to purchase certain quantities of sheets for a guaranteed price.

128.    Defendants Cowden and Jackie Cowden, at all times relevant, were fully aware of the OPA, entered into between Custom and Stonewall.

129.    Defendants Cowden and Jackie Cowden intentionally and maliciously prohibited Custom from placing any sufficient orders with Stonewall and/or purchased only insignificant amount of sheets from Stonewall, all done in knowing breach of the OPA entered into between Custom and Stonewall.

130.    The actions of Defendants Cowden and Jackie Cowden induced and/or procured the breach of the OPA entered into between Custom and Stonewall.

131.    As a direct and proximate cause of Defendants Cowden and Jackie Cowden's inducement, Stonewall was forced into a receivership.

132.    These tortious acts by Defendants Cowden and Jackie Cowden directly and proximately caused injury resulting in damages to the Plaintiffs, in an amount in excess of $2,700,000.00 and more specifically, in an amount as determined by the jury.

## COUNT V – FRAUD

133.    The Plaintiffs incorporate Paragraphs 1 to 107 as if fully set forth herein.

134.    As detailed above, Defendant West made false representations of past or existing facts to the Plaintiffs.

135.    The misrepresentations made by Defendant West concerned material facts.

136.    Defendant West intentionally, knowingly and/or with reckless disregard for its truth, made these statements to the Plaintiffs with the intent to fraud and defraud the Plaintiffs.

137.    The Plaintiffs reasonably relied on Defendant West's false representations that he and Custom would purchase a specific amount of board feet. Defendants never purchased the agreed amount as required under the OPA and as such Stonewall failed.

138.    Additionally, in executing the OPA, Defendant West represented that he had "the requisite power and authority to enter into this Agreement and the transactions contemplated hereby and to perform its obligations hereunder and thereunder." (See Exhibit 1, Sect. 14(a)(i)). Defendant West further represented that he had "duly authorized the execution, delivery, and performance of this Agreement and has taken all action necessary or appropriate to ensure that this Agreement, when executed and delivered by Purchaser and when duly executed and delivered by Seller, will constitute the valid and legally binding obligations of Purchaser enforceable in accordance with its terms…" (See Exhibit 1, Sect. 14(a)(ii)). To the extent

21

Defendant West is found to have lacked authority to execute the OPA on behalf of Custom, Defendant West intentionally, knowingly and/or with reckless disregard for its truth, executed the OPA and made those representations to the Plaintiffs with the intent to fraud and defraud the Plaintiffs.

139.    The Plaintiffs reasonably relied on Defendant West's representations contained in Sections 14(a)(i) of the OPA that West had the requisite power and authority to enter into the OPA, and the Plaintiffs reasonably relied on Defendant West's representations contained in Sections 14(a)(ii) of the OPA that he had taken all action necessary and appropriate to ensure that the OPA would constitute the valid and legally binding obligations of Custom.

140.    By reason of the foregoing, the Plaintiffs have suffered money damages as stated previously.

## COUNT VI – TORTIOUS INTERFERENCE WITH AN EXISTING BUSINESS RELATIONSHIP

141.    The Plaintiffs incorporate Paragraphs 1 to 107 as if fully set forth herein.

142.    Stonewall had an existing business relationship with Defendant West, by and through Turkey Fields, as evidenced by the LLC agreement, of which Defendants Cowden and Custom were aware.

143.    It was Defendant Cowden, Defendant Jackie Cowden and Defendant Custom's intent to cause the breach and/or termination of that business relationship by improper motive and/or means.

144.    By reason of the forgoing, the Plaintiffs have suffered money damages as stated previously.

145.    Stonewall had an existing business relationship with Defendant Custom, as evidenced by the OPA, of which Defendants Cowden and Jackie Cowden were aware.

146. It was Defendant Cowden's and Defendant Jackie Cowden's intent to cause the breach and/or termination of that business relationship by improper motive and/or means.

147. By reason of the foregoing, the Plaintiffs have suffered money damages as stated previously.

## COUNT VII - INTENTIONAL INTERFERENCE WITH CONTRACT AND BUSINESS RELATIONSHIP

148. The Plaintiffs incorporate Paragraphs 1 to 107 as if fully set forth herein.

149. Defendant Cowden and Defendant Jackie Cowden, at all times relevant, were fully aware of the OPA, agreement and business dealings by and between the Plaintiffs and Custom and the LLC agreement and business dealings between the Plaintiffs and Defendant West.

150. Notwithstanding their knowledge of the OPA, LLC agreement and business dealings between Custom and the Plaintiffs, Defendants Cowden and Jackie Cowden intentionally and maliciously prohibited Custom from placing any sufficient orders with Stonewall and/or purchased only insignificant amount of sheets from Stonewall, all done in knowing breach of the OPA entered into between Custom and Stonewall.

151. Defendants Cowden and Jackie Cowden did so with the intent that Stonewall would not be profitable and/or would otherwise be forced to shut down its operations.

152. Notwithstanding their knowledge of the LLC agreement and business dealings between Stonewall and Defendant West, Defendants Cowden and Jackie Cowden intentionally and maliciously prohibited Custom from placing any sufficient orders with Stonewall and/or purchased only insignificant amount of sheets from Stonewall, all of which knowingly caused Defendant West to violate the terms of the LLC agreement entered into between Defendant West and Stonewall.

23

153. Defendants Cowden and Jackie Cowden did so with the intent that Stonewall would not be profitable and/or would otherwise be forced to shut down its operations.

154. As a direct and proximate cause of Defendant Cowden's and Defendant Jackie Cowden's intentional interference with the LLC agreement and OPA, Stonewall was forced into receivership.

155. These tortious acts by Defendant Cowden and Defendant Jackie Cowden directly and proximately caused injury resulting in damages to the Plaintiffs as previously stated.

156. The conduct of Defendant Cowden and Defendant Jackie Cowden violated Tenn. Code Ann. § 47-50-109.

157. The conduct of Defendant Cowden and Defendant Jackie Cowden was willful and as such Plaintiffs are entitled to treble damages.

## COUNT VIII – COMMON LAW INTENTIONAL INTERFERENCE WITH CONTRACT

158. The Plaintiffs incorporate Paragraphs 1 to 107 as if fully set forth herein.

159. Defendants Cowden and Jackie Cowden at all times relevant hereto were aware of the OPA, agreement and business relationship by and between Custom and Stonewall.

160. Despite this knowledge, Defendant Cowden and Defendant Jackie Cowden intentionally and maliciously worked to induce Custom to breach the OPA by refusing to place any sufficient orders with Stonewall and/or ordering amounts significantly less than those required under the OPA.

161. The conduct of Defendant Cowden and Defendant Jackie Cowden interfered with the business and/or contractual relationship between Custom and Stonewall and caused Stonewall to suffer severe cash flow problems, ultimately leading to and causing the failure of Stonewall.

24

162.    The conduct of Defendants Cowden and Jackie Cowden, with full knowledge of the OPA, LLC agreement and business relationship by and between Custom and Stonewall, was for the sole purpose of causing damages to the Plaintiffs.

163.    These tortuous acts by Defendants Cowden and Jackie Cowden directly and proximately caused injury resulting in damages to the Plaintiffs as previously stated.

## COUNT IX – BREACH OF FIDUCIARY DUTY

164.    The Plaintiffs incorporate Paragraphs 1 to 107 as if fully set forth herein.

165.    As a member of the board of directors for Stonewall, Defendant West had a duty to act as a fiduciary in connection with his execution of the LLC agreement and the OPA, and Defendant West likewise had a duty to exercise good faith and due diligence on behalf of Stonewall.

166.    Each of Defendant West's acts and/or omissions constitutes breaches of the fiduciary duty he owed to Stonewall.

167.    By reason of the foregoing, Stonewall has directly and proximately suffered money damages.

## COUNT X – CIVIL CONSPIRACY

168.    The Plaintiffs incorporate Paragraphs 1 to 107 as if fully set forth herein.

169.    Upon information and belief, Defendants West, Cowden and Jackie Cowden entered into an agreement to accomplish unlawful purposes and participated in a civil conspiracy for the purpose of causing damage to the Plaintiffs by causing Stonewall to not be profitable and/or otherwise shut down operations and for the purpose of causing many of Defendant Custom's competitors to lose millions of dollars they had invested into Stonewall.

Case 3:11-cv-00120   Document 1   Filed 02/11/11   Page 25 of 29 PageID #: 25

170. These actions by Defendants West, Cowden and Jackie Cowden have directly and proximately caused the Plaintiffs to suffer money damages.

## COUNT XI – FRAUDULENT INDUCEMENT TO CONTRACT

171. The Plaintiffs incorporate Paragraphs 1 to 107 as if fully set forth herein.

172. On two separate occasions, Defendant West, acting in his capacity as President of Custom Packaging, executed an OPA between Custom Packaging and Stonewall.

173. In executing said OPA, Defendant West represented that he "has the requisite power and authority to enter into this Agreement and transactions contemplated hereby and to perform its obligations hereunder and thereunder." (See Exhibit 1, Sect. 14(a)(i). Defendant West further represented that he had "taken all action necessary or appropriate to ensure that this Agreement …will constitute the valid and legally binding obligation of Purchaser enforceable in accordance with its terms." (See Exhibit 1, Sect. 14(a)(ii). Defendant West further represented that the execution of the OPA will not "conflict with or constitute a breach of Purchaser's charter documents." (See Exhibit 1, Sect. 14(a)(i)).

174. The Plaintiffs relied on the representations made by Defendant West on behalf Custom, and executed the OPA. The Plaintiffs further relied on the representations made by Defendant West on behalf of Custom contained in the OPA and entered into a lending agreement with ACB.

175. The Defendants had knowledge that certain representations contained in the OPA were false.

176. The Defendants were aware that the Plaintiffs relied on the representations made by Custom in the OPA when the Plaintiffs executed the OPA, and the Defendants intended to induce the Plaintiffs reliance on the representations.

26

177.     The Defendants were aware that the Plaintiffs relied on the representations made in the OPA in executing the lending agreement with ACB, and the Defendants intended to induce the Plaintiffs reliance on the representations contained in the OPA.

178.     Despite the representations contained in the OPA, which the Plaintiffs reasonably relied upon in entering into both the OPA and the lending agreement with ACB, the Defendants now fail to acknowledge those representations and/or have taken action with otherwise indicates that certain representations made by Custom were false.

179.     As a result of Defendants' misrepresentations that induced the Plaintiffs to enter into both the OPA and the lending agreement with ACB, Plaintiffs have been damaged in an amount to be proved at trial but in excess of $2,700,000.00.

### COUNT XII – PUNITIVE DAMAGES

180.     Plaintiffs incorporate Paragraphs 1 to 107 as if fully set out herein.

181.     Plaintiffs aver that the acts and false representations of the Defendants constitute conduct that was either intentional, reckless, malicious and/or fraudulent and that Plaintiffs are entitled to an award of punitive damages against the Defendants in an amount that the Court finds proper and just as a result of this conduct.

WHEREFORE, premises considered, the Plaintiffs pray as follow:

1.     That this Complaint be served upon the Defendants and that they be required to Answer same in the time allowed by law;

2.     That these Defendants be found to have violated one or more of the counts set out herein;

3.     That judgment be entered in favor of the Plaintiffs against the Defendant Chuck Cowden for all damages incurred and further for punitive damages and treble damages, along

with attorney's fees, as provided in Tenn. Code Ann. § 47-50-109, and any other relief as may be just and proper, including, without limitation, interest and costs;

4.     That judgment be entered in favor of the Plaintiffs against the Defendant Jackie Cowden for all damages incurred and further for punitive damages and treble damages, along with attorney's fees, as provided in Tenn. Code Ann. § 47-50-109, and any other relief as may be just and proper, including, without limitation, interest and costs;

5.     That judgment be entered in favor of the Plaintiffs against the Defendant Custom for damages in excess of $2,700,000.00 and more specifically, in an amount as determined by the jury, incurred and further for punitive damages and any other relief as may be just and proper, including, without limitation, interest and costs;

6.     That judgment be entered in favor of the Plaintiffs against the Defendant West for damages in excess of $2,700,000.00 and more specifically, in an amount as determined by the jury, incurred and further for punitive damages and any other relief as may be just and proper, including, without limitation, interest and costs.

7.     That judgment be entered in favor of the Plaintiffs against all of the Defendants for all of the damages incurred by the Plaintiffs as a result of the Defendants' wrongful conduct, in an amount to be proven at trial but in any event in an amount in excess of $2,700,000.00;

8.     That the Plaintiffs be awarded their costs of this cause, including discretionary costs incurred by the Plaintiffs, and that all costs be taxed to the Defendants;

9.     That Plaintiffs be awarded such other general and equitable relief as the Court deems appropriate; and

10.     That a jury of six (6) persons be empanelled to try any and all issues so triable pertaining to this cause.

RESPECTFULLY submitted this 10th day of February, 2011.

> INTERNATIONAL FOREST PRODUCTS
> CORPORATION; AND INTERNATIONAL
> FOREST PRODUCTS CORPORATION as
> assignee of STONEWALL PACKAGING, LLC
>
> By: _____
> ROBERT H. WATSON, JR., BPR NO. 1702
> REID A. SPAULDING, BPR NO. 023363
> Attorneys for Plaintiffs
> WATSON, ROACH, BATSON,
> ROWELL & LAUDERBACK, P.L.C.
> Attorneys at Law
> 1500 Riverview Tower
> 900 South Gay Street
> P.O. Box 131
> Knoxville, Tennessee 37901-0131
> (865) 637-1700