# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| INTERNATIONAL FOREST PRODUCTS ) | |
| CORPORATION, and as assignee of ) | |
| STONEWALL PACKAGING, LLC, ) | |
| ) | |
| Plaintiff, ) | No. 3:11-0120 |
| ) | Judges Haynes/Bryant |
| v. ) | |
| ) | |
| GARY WEST, et al., ) | |
| ) | |
| Defendants. ) | |

TO: The Honorable William J. Haynes, Jr.

## REPORT AND RECOMMENDATION

All pending motions have been referred to the undersigned Magistrate Judge for a report and recommendation as to disposition. (Docket Entry No. 5.) Defendants Gary West and Turkey Fields, LLC, ("Turkey Fields"),[1] filed a motion to dismiss Plaintiff's original complaint (Docket Entry No. 1) on March 11, 2011. (Docket Entry No. 14.) Defendants Custom Packaging, Inc., ("Custom"), Chuck Cowden, and Jackie Cowden[2] also filed a motion to dismiss Plaintiff's original complaint on March 11, 2011. (Docket Entry No. 19.) Plaintiff was subsequently granted leave by the Court to file an amended complaint. (Docket Entry No. 48.) Both the West Defendants and the Custom Defendants filed motions to dismiss the amended complaint (Docket Entry Nos. 50, 54), to which Plaintiff filed a consolidated response (Docket Entry No. 64), and

---

[1] Defendants Gary West and Turkey Fields will be referred to collectively hereinafter as the "West Defendants."

[2] Defendants Custom Packing, Inc., Chuck Cowden, and Jackie Cowden will be referred to collectively hereinafter as the "Custom Defendants."

Defendants filed replies (Docket Entry Nos. 68, 70). As such, the previously filed motions to dismiss the original complaint (Docket Entry Nos. 14, 19) should be denied as moot. Thus, the remaining motions for consideration are the motions to dismiss the amended complaint. (Docket Entry Nos. 50, 54.)

For the reasons stated below, the undersigned Magistrate Judge recommends that the West and Custom Defendants' motions to dismiss the amended complaint be granted in part and denied in part, and that the Court abstain from adjudicating this matter pursuant to the abstention principles announced in Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976).

**Statement of the Case**

Plaintiff International Forest Products Corporation, ("IFP"), filed this civil action against multiple Defendants, and subsequently amended its complaint with leave of Court (Docket Entry Nos. 1, 48, 49). Plaintiff also brings suit as assignee of Stonewall Packaging, LLC, ("Stonewall"). (Am. Compl. at 1.) This diversity action is based upon an alleged contract between Custom and Stonewall for the purchase of significant output of Stonewall's corrugated containerboard plant. (Am. Compl. ¶ 46.) Plaintiff, on its own behalf and as assignee, makes numerous claims for breach of contract, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, inducement to breach contract, fraud, tortious interference with an existing business relationship, intentional interference with contract and business relationship, common law intentional interference with contract, breach of fiduciary duty, civil conspiracy, and fraudulent inducement to contract.

The West Defendants contend that the amended complaint must be dismissed as to the claims against them for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docket Entry No. 59, Mem. in Supp. at 29.) Alternatively, the West Defendants contend that the Court should abstain from exercising jurisdiction over the claims against them in light of the pending state action in Wilson County. (Docket Entry No. 59, Mem. in Supp. at 29.) The Custom Defendants contend that this Court must dismiss the amended complaint entirely under Rule 12(b)(1) for lack of subject matter jurisdiction because Stonewall's assignment of its claims to Plaintiff is collusive in light of 28 U.S.C. § 1359. (Docket Entry No. 57, Mem. in Supp. at 10.) The Custom Defendants further contend that the amended complaint must also be dismissed for failure to state a claim pursuant to Rule 12(b)(6). (Docket Entry No. 57, Mem. in Supp. at 17.) Alternatively, the Custom Defendants also contend that this Court should abstain from exercising jurisdiction in this case pursuant to the abstention doctrine of Colorado River. (Docket Entry No. 57, Mem. in Supp. at 30-31.)

**Statement of Facts**

Plaintiff IFP is a Delaware corporation with its principal place of business in Foxboro, Massachusetts. (Am. Compl. ¶ 4.) Defendant Custom is a Tennessee corporation with its principal place of business in Lebanon, Tennessee. (Am. Compl. ¶ 10.) Defendant Turkey Fields is a Tennessee limited liability company with its principal place of business in Lebanon, Tennessee. (Am. Compl. ¶ 11.) Defendant West is a Tennessee resident and was the President and a member of the board of Custom with a fifty percent ownership interest in Custom. (Am. Compl. ¶ 12.) Defendant West is also the President and a member of the board of Turkey Fields with a one hundred percent ownership interest in Turkey Fields. (Am. Compl. ¶ 12.) Defendant

3

West was also a director of Stonewall. (Am. Compl. ¶ 12.) Defendant Chuck Cowden and his wife, Defendant Jackie Cowden[3], are both Tennessee residents. (Am. Compl. ¶ 13, 14.) Defendant Chuck Cowden is the Executive Vice President, Chief Operating Officer, and a member of the board of Custom. (Am. Compl. ¶ 13.) Defendant Jackie Cowden is the Chief Executive Officer and co-Chairman of the Board of Custom. (Am. Compl. ¶ 14.) Together, Defendants Chuck and Jackie Cowden own a fifty percent interest in Custom. (Am. Compl. ¶ 13.)

Plaintiffs and Defendants are all involved, to varying degrees, in the paper and corrugated product industry. (Am. Compl. ¶ 1.) In 2005, non-party Jackson Paper Manufacturing Company, ("Jackson"), explored the idea of bringing together a group of sheet plants to build a sheet feeder corrugated plant, and possibly a recycled linerboard paper mill, known as the Stonewall project.[4] (Am. Compl. ¶ 34, 35.) In 2007, Jackson representatives met with Defendant West and Defendant Chuck Cowden regarding the Stonewall project. (Am. Compl. ¶ 36.) Defendant West agreed to join the Stonewall project and invested significant funds through his company, Turkey Fields, in early 2007. (Am. Compl. ¶ 37.) Defendants Chuck and Jackie Cowden also agreed to join the Stonewall project and invested significant funds in 2008. (Am. Compl. ¶ 38.) Throughout 2007 and 2008, Jackson and Defendant West sought the participation of other independent sheet plants in the Stonewall project. (Am. Compl. ¶ 39.) It

---

[3] Defendant Jackie Cowden is also Defendant West's sister. (Am. Compl. ¶ 30.)

[4] The concept for Stonewall was for established participants in the corrugated product industry to pool their resources to build a recycled paper mill and sheet feeder to supply their component needs efficiently. (Am. Compl. ¶ 40.) A Jackson representative explained that the Stonewall project would require over $100 million in investment, with $15 million to be contributed by the participants and the remaining $85 million to be financed. (Am. Compl. ¶ 40.)

was agreed that, for the Stonewall project to succeed, the members would have to purchase the guaranteed amount of seventy percent of their overall purchases of corrugated sheets from Stonewall. (Am. Compl. ¶ 41.) Thus, the members of Stonewall agreed that they would execute an Output Purchase Agreement ("OPA") on behalf of their representative entities that guaranteed each member would purchase a certain stated amount of corrugated sheets from Stonewall at a specified price. (Am. Compl. ¶ 42.)

On January 3, 2008, Stonewall was officially formed as a Delaware limited liability company with its principal place of business in Sylva, North Carolina. (Am. Compl. ¶ 5.) Defendant West became a director of Stonewall at that time, but remained an officer and director of Custom. (Am. Compl. ¶ 50, 51.) Defendant West, through Defendant Turkey Fields, became a member with his investment in Stonewall. (Am. Compl. ¶ 56.) Defendant West continually represented that he would sign the OPA on behalf of Custom and that Custom was capable of purchasing an amount that equaled one-third of the anticipated output of Stonewall. (Am. Compl. ¶ 53.) After Stonewall's formation, efforts to attract additional investors continued. (Am. Compl. ¶ 52.) In February 2009, Jackson representatives contacted Plaintiff IFP seeking IFP's participation and investment in Stonewall. (Am. Compl. ¶ 60, 61.) On May 8, 2009, IFP paid $500,000 to join Stonewall, and, as part of the Joinder Agreement, Stonewall amended its LLC agreement to provide a fourth position on the board of directors of Stonewall to an IFP representative. (Am. Compl. ¶ 64, 66.)

In May 2009, Stonewall purchased the property where its business and operations would be located for $1.4 million. (Am. Compl. ¶ 67.) In June 2009, Stonewall obtained financing for the project through Atlantic Capital Bank ("ACB") and executed a Credit and Security

5

Agreement ("CSA") with ACB. (Am. Compl. ¶ 69, 75.) Pursuant to the terms of the CSA, IFP executed letters of credit in the amount of $1 million to serve as a guarantee in the case of Stonewall's default." (Am. Compl. ¶ 77.) On June 30, 2009, Defendant West executed the OPA on behalf of Custom. (Am. Compl. ¶ 79.) Stonewall commenced operations on November 30, 2009, and, shortly thereafter, began incurring large operating losses. (Am. Compl. ¶ 86, 87.) In November or December of 2009, the Custom Defendants attempted to negotiate a price reduction for Custom that deviated from the OPA. (Am. Compl. ¶ 88.) From the outset and until Stonewall's demise, Defendant West and Custom failed to purchase the amount of containerboard that they had committed to purchase by executing the OPA. (Am. Compl. ¶ 89.) By February 2010, Stonewall had depleted its operating capital and was in danger of being unable to fund day-to-day operations. (Am. Compl. ¶ 94.) On February 11, 2011, a meeting was held with Defendant Chuck Cowden and Stonewall representatives, at which point Defendant Chuck Cowden disputed the validity of the OPA. (Am. Compl. ¶ 96.)

On March 15, 2010, Custom filed a Complaint for Declaratory Judgment and Injunctive Relief against Stonewall in the Circuit Court for Wilson County at Lebanon, Tennessee. (Docket Entry No. 49-2.) In that action, Custom seeks a declaration that the purported OPA is void, illegal, invalid, and unenforceable. (Docket Entry No. 49-2, Compl. at 1.) After the lawsuit was filed, Stonewall filed a motion to compel arbitration, which was denied. (Docket Entry No. 57, Mem. in Supp. at 7.) Stonewall appealed the ruling on the motion to the Tennessee Court of Appeals, but later dismissed its appeal in January 2011. (Docket Entry No. 57, Mem. in Supp. at 7.) Stonewall then filed an Answer and Counterclaim on January 20, 2011, alleging breach of contract by Custom, among other claims. (Docket Entry No. 57, Mem. in Supp. at 7.) The case

has since been returned to state trial court for further proceedings. (Docket Entry No. 57, Mem. in Supp. at 7.)

On March 31, 2010, Stonewall received a notice of default from ACB. (Am. Compl. ¶ 103.) On April 27, 2010, the Stonewall members held a meeting to discuss the status of the company. (Am. Compl. ¶ 105.) At the meeting, the members collectively determined that further capital infusions would be futile and decided to begin researching options for winding up the business. (Am. Compl. ¶ 106.) On May 10, 2010, ACB drew IFP's letters of credit for $1 million, bringing IFP's total financial contribution to Stonewall to $2.7 million. (Am. Compl. ¶ 107.) On May 13, the members of Stonewall authorized the board of directors to consent to appointment of the Atlanta, Georgia, law firm of Grisanti, Galef and Goldress, ("the Receiver"), to oversee liquidation of the company. (Am. Compl. ¶ 109.) On June 9, 2010, the North Carolina Superior Court appointed the Receiver for Stonewall upon the motion of ACB, the administrative agent for Stonewall's creditors. (Docket Entry No. 49-1.)

Pursuant to the Order of Receivership, the Receiver began liquidating the assets of Stonewall and selling all the real and personal property of Stonewall, including all claims belonging to Stonewall for the collection of charges by way of contract, tort, or other cause of action, including the claims that are the subject of this litigation. (Am. Compl. ¶ 8.) On November 10, 2010, pursuant to an Assignment Agreement and Bill of Sale, the Receiver sold and assigned to IFP all claims of Stonewall. (Am. Compl. ¶ 9; Docket Entry No. 49-2.) As consideration, IFP paid the Receiver $100,000, and IFP received all right, title, and interest to the claims, with no interest in the claims remaining with the Receiver. (Am. Compl. ¶ 9.) IFP then brought this action in federal court on its own behalf, and as assignee of Stonewall.

**Legal Analysis**

A. Rule 12(b)(1) Motion to Dismiss for Lack of Subject-Matter Jurisdiction

1. *Standard of Review*

Rule 12(b)(1) motions to dismiss fall into two categories: facial attacks and factual attacks. Gentek Bldg. Prods. v. Sherwin-Williams Co., 491 F.3d 320, 330 (6th Cir. 2007) (citing Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir. 1990)). A facial attack "is a challenge to the sufficiency of the pleading itself" and "the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." United States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994) (citing Scheuer v. Rhodes, 416 U.S. 232, 235-37 (1974)). On the other hand, a factual attack does not challenge the sufficiency of the pleading, but the factual existence of subject-matter jurisdiction. Ritchie, 15 F.3d at 598. With a factual attack, "no presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Id. (citation omitted). In reviewing factual motions, "a trial court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve disputed jurisdictional facts." Ohio Nat'l Life, 922 F.2d at 325. With either type of challenge, the plaintiff bears the burden of proving that jurisdiction exists. RMI Titanium Co. v. Westinghouse Elec. Corp., 78 F.3d 1125, 1134 (6th Cir. 1996); see also Rogers v. Stratton Indus., Inc., 798 F.2d 913, 915 (6th Cir. 1986). If the plaintiff fails to meet this burden, the motion to dismiss must be granted. Fed. R. Civ. P. 12(h)(3); see also Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006).

In this case, the Custom Defendants have not specifically stated whether the challenge to

the Court's subject-matter jurisdiction is facial or factual. However, because Defendants are specifically alleging that the assignment of claims was collusive and intended to manufacture diversity jurisdiction, it appears that Defendants are challenging the existence of subject-matter jurisdiction, not the sufficiency of the pleadings. As such, the undersigned will consider Defendants' motion to dismiss as a factual attack.

2. *Stonewall's Assignment of Claims to IFP*

Plaintiff alleges that this "Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, excluding interest and costs, and complete diversity of citizenship exists between the Plaintiffs and Defendants." (Am. Compl. ¶ 15.) Diversity of citizenship under § 1332 "exists only when no plaintiff and no defendant are citizens of the same state." Curry v. U.S. Bulk Transport, Inc., 462 F.3d 536, 540 (6th Cir. 2006) (quoting Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C., 176 F.3d 904, 907 (6th Cir. 1999)); see also Carden v. Arkoma Assoc., 494 U.S. 185, 187 (1990). Moreover, "all unincorporated entities—of which a limited liability company is one—have the citizenship of each partner or member." Delay v. Rosenthal Collins Group, LLC, 585 F.3d 1003, 1005 (6th Cir. 2009). Thus, even if one of the limited liability company's members, or one member of a member, shared citizenship with an opposing party, "then complete diversity, and with it federal jurisdiction, would be destroyed." Id. (citing Caudill v. N. Am. Media Corp., 200 F.3d 914, 916 (6th Cir. 2000)).

Similarly, under 28 U.S.C. § 1359, a "district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made

9

or joined to invoke the jurisdiction of such court." 28 U.S.C. § 1359. The purpose of this statute was to prevent the manufacture of diversity jurisdiction, so as to avoid "a vast quantity of ordinary contract and tort litigation [being] channeled into the federal courts at the will of one of the parties." Kramer v. Caribbean Mills, Inc., 394 U.S. 823, 828-29 (1969). Therefore, "creation of diversity of citizenship by assignment is a 'manufacture of jurisdiction' and thus, 'improperly or collusively made'…when the primary aim of the transfer…is to manufacture federal jurisdiction." Cardiac Anesthesia Servs., PC v. Cookeville Reg'l Med. Ctr. Auth., 2006 WL 1529399, at *3 (M.D. Tenn. May 31, 2006) (citing Gross v. Houghland, 712 F.2d 1034, 1037-38 (6th Cir. 1983)). Courts are instructed to "ascertain whether a party has attempted to transform a 'local' dispute into an interstate dispute by obtaining the appointment of a representative with diverse citizenship." Cardiac Anesthesia Servs., 2006 WL 1529399, at *4 (quoting Gross, 712 F.2d at 1039 n.9). Furthermore, § 1359 "should [] be construed broadly to bar any improper attempt to create federal diversity jurisdiction." Prudential Oil Corp. v. Phillips Petroleum Co., 546 F.2d 469, 475 (2d Cir. 1976).

Once there has been an assignment that implicates § 1359, the plaintiff has the burden of showing that the primary purpose of the assignment was not to manufacture diversity jurisdiction. Gross, 712 F.2d at 1038. Because of the "ease with which affiliated corporations may shield the real purpose of such transfers from judicial scrutiny and, moreover, the increased possibility of collusion between related entities," assignments between parent companies and their subsidiaries and assignments by corporations to their officers or directors are presumptively ineffective" and warrant particularly close scrutiny. Yokeno v. Mafnas, 973 F.2d 803, 809-10 (9th Cir. 1992); Cardiac Anesthesia Servs., 2006 WL 1529399, at *4 (quoting Airline Reporting

10

Corp. v. S&N Travel, Inc., 58 F.3d 857, 862 (2d Cir. 1995)). To overcome this presumption of collusiveness, "the party asserting diversity must show a legitimate business reason for the transfer." Yokeno, 973 F.2d at 810. However, "[s]imply articulating a business reason is insufficient; the burden of proof is with the party asserting diversity to establish that the reason is legitimate and not pretextual." Id. Because these assignments must be evaluated with heightened scrutiny, "the proffered business reason for the assignment must be evaluated in light of the totality of the circumstances." Id. The relevant factors for consideration include whether the assignment was supported by adequate consideration, whether the assignor "expressly disavowed any continuing interest in the litigation or its proceeds…the timing of the assignment, the purpose and underlying motivation for the assignment, and the assignee's preexisting interest in the claim." Id. (citing Dweck v. Japan CBM Corp., 877 F.2d 790, 793 (9th Cir. 1989); Steele v. Hartford Fire Ins. Co., 788 F.2d 441, 444 (7th Cir. 1986); Prudential Oil, 546 F.2d at 476-77; Haskin v. Corporacion Insular de Seguros, 666 F. Supp. 349, 354-56 (D.P.R. 1987)). Furthermore, where a presumption of collusion exists, "[t]hat presumption is heightened where a jurisdictional motive is apparent" and the "business reason must be sufficiently compelling that the assignment would have been made absent the purpose of gaining a federal forum." Yokeno, 973 F.2d at 811.

Here, Stonewall is a resident of Tennessee for diversity jurisdiction purposes because at least one of its members, Turkey Fields, is a Tennessee resident and, therefore, Stonewall's presence in this case would destroy federal diversity jurisdiction. Delay, 585 F.3d at 1005. However, because Stonewall's claims were assigned to IFP, a Delaware and Massachusetts resident, there is apparent diversity in this case. (Docket Entry No. 49-2.) On balance, this

11

assignment from a limited liability company[5] to one of its members that also controls one of its four directors is presumptively collusive and warrants heightened scrutiny. Cardiac Anesthesia Servs., 2006 WL 1529399, at *4; Yokeno, 973 F.2d at 809-10; see also (Am. Compl. ¶ 64, 66). It therefore falls to IFP to rebut this presumption of collusiveness.

Plaintiff first contends that it had a significant preexisting interest in the claims at issue, namely a $2.7 million investment that gave Plaintiff a 21.2 percent ownership stake in Stonewall. (Am. Compl. ¶ 107.) Plaintiff also offers the assignment and sale contract entered into by Plaintiff and GGG, as Stonewall's receivers, as evidence that Stonewall has "expressly disavowed any continuing interest in the litigation or its proceeds." (Docket Entry No. 49-2.) Similarly, Plaintiff paid $100,000 as consideration for the assignment of all of Stonewall's claims, except those excluded claims in Schedule 1 of the contract. (Docket Entry No. 49-2, Assignment Agreement at 1.)

Most importantly, the Plaintiff's purported reasons for the assignment, as evidenced by the affidavit of Plaintiff's Chief Operating Officer Daniel J. Moore, "to maximize recovery" and "to adequately protect IFP's recovery rights," are supported by the fact that the Receiver, a Georgia law firm, could have brought this action in federal court absent the assignment to IFP, thus removing any need for assignment in order to attain diversity of citizenship among representatives of these competing interests. Shamis, 1997 WL 473577, at *8 n.3 ("Because the

---

[5] IFP contends that the presumption of collusiveness does not apply here because the assignment was between the Receiver and IFP, which are not closely affiliated entities. (Consol. Resp. at 5.) While the assignment agreement is between the Receiver and IFP, the Receiver is not the real party in interest to the OPA at issue in these claims. (Docket Entry Nos. 1-1, 49-2.) The Receiver is appointed only to wind up the affairs of Stonewall and, while this appointment has not been challenged under § 1359, it cannot obscure the substance of the transaction as an assignment of claims from a company to its director and member. See Shamis v. Ambassador Factors Corp., 1997 WL 473577, at *8 (S.D.N.Y. Aug. 18, 1997) (analyzing § 1359 collusiveness upon premise that assignor was the "insolvent and defunct entity whose affairs were in the process of being wound up by its appointed receivers…").

assignment would not have been necessary to invoke jurisdiction, it would not be collusive, and [the assignee] could prosecute this action."); see also Navarro Savings Ass'n v. Lee, 446 U.S. 458, 461 (1980) ("We have repeatedly held that representatives may stand upon their own citizenship in the federal courts irrespectively of the citizenship of the persons whom they represent.")

In light of the foregoing, the undersigned finds that Plaintiff has rebutted the presumption of collusiveness and established a legitimate business reason for the assignment that is not pretextual. Yokeno, 973 F.2d at 810. Plaintiff had a significant preexisting financial interest, Stonewall retained no interest in the litigation, consideration was paid for the claims, and the Receiver could have brought the claims on Stonewall's behalf in federal court had it chosen to do so. Thus, Plaintiff's business reasons of maximizing recovery and protecting its interests are sufficiently compelling to support its position that the assignment was made without any collusive purpose of creating federal diversity jurisdiction. Yokeno, 973 F.2d at 811.

Thus, the undersigned recommends that the Custom Defendants' motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction be denied. However, the undersigned does find that the Court should abstain from exercising jurisdiction over this case under the Colorado River abstention doctrine, as explained below.

B. Colorado River Abstention

Both the West and Custom Defendants have moved to stay the federal action in this court under the Colorado River abstention doctrine. (Docket Entry No. 54, Custom Defs.' Mot. to Dismiss at 2; Docket Entry No. 59, West Defs.' Mem. in Supp. at 28.) Under that doctrine, a court may stay a federal case "due to the presence of a concurrent state proceeding for reasons of

wise judicial administration." Colorado River, 424 U.S. at 818. Abstention is justified by "considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" Id. at 817 (quoting Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 183 (1952)). Analysis under Colorado River is composed of two parts: first, the court must determine that the concurrent state and federal actions are actually parallel, and, second, the court must weigh the multiple factors identified by the Supreme Court in Colorado River, 424 U.S. at 818-19, and Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 23-26 (1983).

1. *Parallelism Analysis*

"Exact parallelism is not required;" the two proceedings must only be "substantially similar" in order to be parallel for abstention purposes. Romine v. Compuserve Corp., 160 F.3d 337, 340 (6th Cir. 1998) (quoting Nakash v. Marciano, 882 F.2d 1411, 1416 (9th Cir. 1989)). Likewise, "there is no requirement that the parties in the state court proceedings be identical to those in the federal case." Bates v. Van Buren Township, 122 Fed. Appx. 803, 806 (6th Cir. Dec. 6, 2004) (citing Heitmanis v. Austin, 899 F.2d 521, 528 (6th Cir. 1990)). In fact, "the argument that abstention is inappropriate because the federal cause of action included parties not present in the state proceedings 'is not relevant to *Colorado River* abstention.'" Romine, 160 F.3d at 340 (citing Heitmanis, 899 F.2d at 528). Thus, the question becomes "whether there is a 'substantial likelihood' that the state court litigation 'will dispose of all claims presented in the federal case.'" Hooker v. Chickering Props., LLC, 2007 WL 1296051, at *3 (M.D. Tenn. May 1, 2007) (quoting AAR Int'l, Inc. v. Nimelias Enters., S.A., 250 F.3d 510, 518 (7th Cir. 2001)).

14

In this case, the undersigned finds that the state and federal proceedings are parallel. Although the remedies sought in the state and federal proceedings are different,[6] both cases involve the respective rights and obligations of the parties to the OPA and the validity of that contract. In the state case, Custom, as Plaintiff, contends that the OPA is invalid and unenforceable, while Stonewall, as Defendant, contends that the OPA is valid and enforceable and counterclaims that Custom breached the OPA. (Docket Entry Nos. 52-3, 52-4.) In the federal case, Plaintiff IFP, also as assignee of Stonewall, claims again that the OPA is valid and enforceable and that Defendant Custom breached the OPA, along with several other claims. (Am. Compl. 19-32.) In fact, the validity of the OPA must be established as an element of the claims in Count I for breach of contract, Count II for breach of implied covenants of the contract, Count IV for inducement to breach, Count VI for tortious interference with existing business relationship, Count VII for intentional interference with contract and business relationship, Count VIII for common law intentional interference with contract, and Count XI for fraudulent inducement to contract. Furthermore, the applicable law in and the interpretation of certain contract provisions, including the anti-reliance provision pertinent to the claims of negligent misrepresentation in Count III and fraud in Count V, will depend on the validity of the OPA. Thus, there is a substantial likelihood that the state court's resolution of the validity of the OPA will dispose of all of the claims made in the federal case. Accordingly, the proceedings are

---

[6] In the state case, Custom seeks (1) a declaratory judgment against Stonewall that the OPA is invalid and (2) injunctive relief from Stonewall's enforcement of the OPA. (Docket Entry No. 52-3, State Compl. at 6-7.) In the federal case, IFP, on its behalf and as assignee of Stonewall, seeks compensatory and punitive damages against Custom and other defendants. (Docket Entry No. 49, Am. Compl. at 33-34.)

sufficiently parallel and the undersigned must consider the Colorado River and Moses H. Cone factors for abstention.

2. *The Colorado River/Moses H. Cone Factors*

The undersigned must next address the eight factors that have been enumerated by the Supreme Court, which "are: (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction." Moses H. Cone, 460 U.S. 1, 23-26; Colorado River, 424 U.S. at 818-19.

First, although there is real property involved in this case, the state court has not assumed jurisdiction over that property or any other property. Therefore, the first factor weighs against abstention. As to the second factor, it is difficult to say which forum—Nashville, Tennessee, or Lebanon, Tennessee—is less convenient for the parties. Plaintiff argues that Nashville is more convenient because of its proximity to the airport while Defendants argue that Lebanon is more convenient because most of the witnesses and parties are located in Lebanon. However, the two cities are only about thirty miles apart; thus, the court cannot say that Nashville is less convenient than Lebanon and, therefore, this factor also weighs against abstention.

Nevertheless, the remaining factors strongly support abstention. The third factor is avoidance of piecemeal litigation which was "the consideration that was paramount in *Colorado River* itself." Moses H. Cone, 460 U.S. at 19. "Piecemeal litigation occurs where 'different

16

courts adjudicate the identical issue, thereby duplicating judicial effort and potentially rendering conflicting results.'" Iron Workers of W. Penn. Pension Plan v. Caremark RX, Inc., 2007 WL 60927, at *5 (M.D. Tenn. Jan. 5, 2007) (quoting Romine, 160 F.3d at 337). Because both cases depend upon resolution of whether, as a matter of state law, the OPA is a valid and enforceable contract between the parties, and because that issue is currently being litigated in the state court, "the danger of piecemeal litigation counsels strongly in favor of abstention." Iron Workers, 2007 WL 60927, at *5. Moreover, "judicial economy is not the only value that is placed in jeopardy" by parallel proceedings, but also "[t]he legitimacy of the court system in the eyes of the public…" Romine, 160 F.3d at 341 (quoting Lumen Constr., Inc. v. Brant Constr. Co., 780 F.2d 691, 694 (7th Cir. 1985)).

The fourth and seventh factors must be analyzed together. Moses H. Cone, 460 U.S. at 21-22. The fourth factor, the order in which jurisdiction was obtained, must be analyzed in light of the progress of the two cases, the seventh factor, because "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." Id. at 21. The state case was filed ten months before this federal suit was filed. (Docket Entry No. 52-3, State Compl.) Furthermore, there has been significant progress in the state case since its filing. Stonewall filed its answer and a motion to compel arbitration in that case, which was denied and sent to the Tennessee Court of Appeals on interlocutory appeal. (Docket Entry No. 57, Custom Defs.' Mem. in Supp. at 37.) Stonewall dismissed its appeal and the case has been remanded to the state court for litigation. (Docket Entry No. 57, Custom Defs.' Mem. in Supp. at 37.) Thus, the state court obtained jurisdiction

17

over this matter ten months before the federal district court and there has been significant progress in the state court case. These factors also weigh strongly in favor of abstention.

As to the fifth factor, it is clear that state law governs the causes of action in the state and federal cases, although it is uncertain at this point whether Delaware or Tennessee law will apply. Because there are no federal claims and state law governs both actions, the fifth factor weighs in favor of abstention. Likewise, the sixth factor, the adequacy of the state court action to protect the federal plaintiff's rights, also weighs in favor of abstention. The Wilson County Circuit Court is a more than adequate forum for the parties to litigate their contract and tort claims. Plaintiffs in this case have the same remedies available to them in the state court. Thus, the fifth and sixth factors weigh in favor of abstention.

Finally, the eighth factor, the presence or absence of concurrent jurisdiction, is not a particularly relevant factor in this case because "concurrent jurisdiction is typically discussed only where the case involves a federal cause of action." Iron Workers, 2007 WL 60927, at *6 (citing Moses H. Cone, 460 U.S. at 26; Romine, 160 F.3d at 342). Because there are no federal claims asserted here, this factor is irrelevant. Because the federal and state cases are parallel, and because the Colorado River and Moses H. Cone factors counsel in favor of abstention, the undersigned finds that the Court should abstain from adjudicating this case.

In summary, the undersigned recommends that the Court abstain from exercising jurisdiction over this case under the Colorado River abstention doctrine because the cases are parallel and the Colorado River and Moses H. Cone factors counsel in favor of abstention.

**RECOMMENDATION**

For the reasons stated above, the undersigned Magistrate Judge **RECOMMENDS** that the motions to dismiss the original complaint (Docket Entry Nos. 14 and 19) be **DENIED** as moot; that the West Defendants' motion to dismiss the amended complaint (Docket Entry No. 50) be **GRANTED** in part and **DENIED** in part; and that the Custom Defendants' motion to dismiss the amended complaint (Docket Entry No. 54) be **GRANTED** in part and **DENIED** in part. The undersigned recommends that the motions to dismiss the amended complaint be denied as to the Rule 12(b)(1) jurisdictional argument and the Rule 12(b)(6) dismissal argument, and granted as to the arguments for abstention. Accordingly, the undersigned recommends that proceedings in this case be **STAYED** pending resolution of the parties' litigation in Wilson County Circuit Court.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days from service of this Report and Recommendation in which to file any written objections to this Recommendation, with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in this Report in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).

**ENTERED** this 8th day of August, 2011.

    s/ John S. Bryant
    JOHN S. BRYANT
    United States Magistrate Judge